**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

LUZ TEXIDOR,

                                                  **Case No.: 1:21-cv-4845**

                         **Plaintiff,**

           -against-

TROMBERG, MORRIS, & POULIN, PLLC
f/k/a STEPHEN EINSTEIN & ASSOCIATES, P.C.,
STEPHEN EINSTEIN,
COLLINS FINANCIAL SERVICES, INC.,
ABC PROCESS SERVING BUREAU, INC., d/b/a
ABC PROCESS SERVICE and
AZZAM ABDERRAHMAN,

                                **Defendants.**

-----------------------------------------------------------------X

## COMPLAINT AND JURY DEMAND

     Plaintiff brings this action for Defendants Tromberg, Morris, & Poulin, PLLC f/k/a Stephen Einstein & Associates, P.C., Stephen Einstein, Collins Financial Services, Inc., ABC Process Serving Bureau, Inc. d/b/a ABC Process Service, and Azzam Abderrahman's violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. and New York General Business Law § 349 *et seq.*, and for Tromberg and Stephen Einstein's violations of New York Judiciary Law § 487 *et seq*., and in support alleges as follows.

## SUMMARY OF CLAIMS[1]

     Defendants are a debt collection law firm Tromberg, Morris, & Poulin, PLLC f/k/a Stephen Einstein & Associates, P.C. ("Tromberg"), a partner at the firm, Stephen Einstein, a putative assignee creditor and judgment creditor, Collins Financial Services ("CFS"), a process serving company, ABC Process Serving Bureau, Inc. d/b/a ABC Process Service ("ABC Process"), and its process server, Azzam Abderrahman.

---



1 This summary is for the convenience of Defendants and the Court. The summary is not intended to limit the basis of Plaintiff's claims as the full factual basis for the claims are laid out in far greater detail in the statement of facts.

In 2008, Defendant CFS, through Defendant law firm Tromberg and attorney Mr. Einstein filed a collection lawsuit that was time-barred. The very face of the verified complaint alleges the claim arose from "Credit Agreement with Plaintiffs predecessor in interest, American Investment Bank/Dell Computer."   Therefore Defendants CFS, Tromberg, and Mr. Einstein knew, or certainly should know by engaging in a required meaningful attorney review of the account, that the suit sought to collect a putative debt arising from financing for the sale of goods from Dell Computer. The statute of limitations for the debts arising from the sale of goods is governed by   UT ST § 70A-2-725, Utah's adoption of U.C.C. § 2-725, a four year statute of limitations that also applies in New York (N.Y. U.C.C. § 2-725) and most other states. However, the Complaint states the debt was allegedly in default for at least five years.  And in any event, Ms. Texidor never owed the debt; it arose from the theft of her identity.

Worse still, Defendants CFS and Tromberg used a false affidavit of service to obtain a "sewer service"[2] default judgment in 2008. The process server, Defendant Abderrahman of Defendant ABC Service, is notorious for executing false affidavits of service, so much so that he was repeatedly sanctioned and ultimately had has license revoked for systematically executing false affidavits.

Twelve years later, October 6, 2020, Mr. Einstein, for CFS and Tromberg, relied on the sewer service judgment to sign an income execution to garnish Ms. Texidor's wages and had it served on the employer of Ms. Texidor.  The garnishment attempt was the first time Ms. Texidor learned of the lawsuit or the judgment. Ms. Texidor, *pro se*, filed an Order to Show Cause (OSC) to vacate the default judgment. Defendants CFS and Tromberg doubled down. By 2020, Mr.

---

2 *See, e.g. Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413, 418 (S.D.N.Y. 2010) (""[S]ewer service" [is] the practice of failing to serve a summons and complaint and then filing a fraudulent affidavit attesting to service. When the debtors failed to appear in court because they did not have notice of the lawsuits, defendants obtained default judgments against them.")

Abderrahman's systematical sewer services was well documented and well known, and his process server license has been suspended since 2014. Despite this, CFS and Tromberg filed an Opposition to the OSC relying on (but coyly not attaching) the false affidavit of service to attempt to retain the illicit benefit of the fraudulently obtained judgment from a time-barred lawsuit by opposing Ms. Texidor's OSC. After weeks of stress, expenses for postage, copies, travel and notarization, lost time from work, Ms. Tromberg ultimately succeeded in having the default judgment vacated and the action discontinued.

Ms. Texidor now moves to hold to Defendants accountable. She brings suit against CFS, Tromberg, Mr. Einstein, Mr. Abderrahman and ABC Process for their violations of the Fair Debt Collection Practices Act and New York General Business Law § 349 *et seq*., and against Tromberg and Mr. Einstein for their violations of New York Judiciary Law § 487 *et seq*.

## A.  JURISDICTION AND VENUE

1. The Court has federal question jurisdiction over the lawsuit because the action arises under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, ("FDCPA"). Jurisdiction of the Court arises under 28 U.S.C. § 1331 because this dispute involves predominant issues of federal law, the FDCPA. Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. The Court has supplemental jurisdiction under 28 U.S.C. §1367 over Plaintiff's state law claims because said claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. Venue in this District is proper because all or a substantial part of the events or omissions giving rise to their claims occurred in Kings County, New York.

## B.  PARTIES

3. Plaintiff Luz Texidor is an individual currently residing in The Bronx County, New York.

4.      Defendant Tromberg, Morris, & Poulin, PLLC f/k/a Stephen Einstein & Associates ("Tromberg") is a professional limited liability corporation organized under the laws of the State of New York, with its principal place of business at 39 Broadway Suite 1250, New York, NY 10006. This suit arose out of Tromberg's business in New York.

5.      Tromberg regularly collects on consumer debts owed or due another via sending thousands of collection letters, file thousands of collection lawsuits, and collecting on judgments by using thousands of information subpoenas, bank restraints, and income executions, and the collection of consumer debts is the principal purpose of Tromberg's business. Tromberg is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

6.      Defendant Stephen Einstein is a partner at Tromberg and, on information and belief, organizes, manages, and controls the operation of Tromberg. Mr. Einstein, on information and belief, is a resident of the State of New York. Mr. Einstein regularly collects on consumer debts owed or due another by signing thousands of collection lawsuits, and collecting on judgments by signing thousands of information subpoenas, bank restraints, and income executions. Upon information and belief, a majority of Tromberg's thousands of collection lawsuits and post-judgment collection devices go out under the putative signature of Mr. Einstein. Mr. Einstein is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

7.      Defendant Collins Financial Services, Inc. ("CFS") is a foreign corporation organized under the laws of the State of Texas. This suit arises from the business and conduct of CFS in New York State.

8.      CFS's principal (indeed sole) purpose is the purchase of thousands of charged-off putative consumer debts and having those debts collected upon.

9.      This includes over 85,000 debts arising from the financing of the sale of goods from Dell

Computers.  CFS then collects on those putative debts by, *inter alia*, retaining debt collection laws firms like Tromberg to file thousands of collection lawsuits, obtaining thousands of judgments and then retaining debt collection law firms like Tromberg to collect on those thousands of judgments using thousands of information subpoenas, bank restraints, income executions and dunning letters. CFS is a debt collector as defined in 15 U.S.C. § 1692a(6).

10.     CFS engages in this purchasing and collection of consumer debts with its affiliate Collins Receivables, LLC and its parent company Collins Financial Services USA, Inc. CFS, Collins Receivables, LLC, and Collins Financial Services USA, Inc. share the same managers, executive officers, and directors,  and the three companies operate as one joint debt collection enterprise. **Exhibit A** (Collins Receivables Prospectus).

11.     Defendant ABC Process Serving Bureau, Inc. d/b/a ABC Process Service ("ABC Process") is a process serving agency organized under the laws of the State of New York.  ABC Process regularly fails to serve summons and complaints, and regularly executes false affidavits of service allowing the entry of default judgments against putative debtors. ABC Process is therefore a debt collector within the meaning of 15 U.S.C. § 1692a(6).

12.     Defendant Azzam Abderrahman ("Abderrahman") was a process server for ABC Process who executed the false affidavit of service contending that he served the collection lawsuit on Luz Texidor at an address Ms. Texidor never lived at. Mr. Abderrahman is a notorious sewer service process server whose license was suspended by the New York City Department of Consumer Affairs in 2014, a suspension which remains in effect. Mr. Abderrahman regularly failed to serve summons and complaints, and regularly executed false affidavits of service allowing debt collectors, including Tromberg, to enter default judgments against consumers such as Ms. Texidor. Mr. Abderrahman is therefore a debt collector as defined by 15 U.S.C. §

1692a(6).

## C.  STATEMENT OF FACTS

13.     Unbeknownst to Ms. Texidor at that time, her identity was fraudulently used on or around June 25, 2001 to allegedly purchase goods from Dell Computer with a putative consumer finance agreement with American Investment Bank, N.A.

14.     On May 25, 2002, Ms. Texidor was arrested on a drug-related criminal offense.

15.     American Investment Bank charged off the putative debt on or around January 29, 2003, and sometime between January 29, 2003 and February 19, 2008, the putative debt was allegedly sold to CFS.

16.     On February 26, 2003, Ms. Texidor was convicted of a drug-related criminal offense, and on or around April 23, 2003, she was sentenced to 7 years, which would later be reduced.

17.     Ms. Texidor was incarcerated from May 5, 2003 to February 2, 2007, when she was released to parole supervision, which she remained in until June 28, 2009.

18.     As a standard condition of her parole, Ms. Texidor was expected to regularly report information to her parole officer, including but not limited to her residence and any time her residence changed.

19.     Consequently, the Department of Corrections holds records for her residence from her arrest on May 25, 2002 until the end of her parole on June 28, 2009.

20.     On or about February 19, 2008, Collins Financial Services, Inc. ("CFS"), filed a summons and verified complaint by and through Tromberg, which at the time used the name Stephen Einstein & Associates, P.C., against Ms. Texidor, titled *Collins Financial Services, Inc. v. Luz Texidor,* Index No. 20867-08/KI venued in the Civil Court of the City of New York, County of Kings (the "Collection Lawsuit"). **Exhibit B** (Summons and Complaint).   The Collection Lawsuit stated it was for a "Consumer Credit Transaction." The complaint was signed

and verified by Mr. Einstein.

**Filing collection lawsuit that was timebarred on its face**

21.     The Collection Lawsuit alleged Ms. Texidor "entered into a Credit Agreement with Plaintiffs [sic] predecessor in interest, American Investment Bank/Dell Computer," and alleged the account was assigned to CFS. The Collection Lawsuit stated that "pursuant to the terms of the agreement" that Ms. Texidor owed $2,539.03 with interest from January 29, 2003, plus costs and disbursements.

22.     The Collection Lawsuit was time-barred because it was filed more than four years from the date of the accrual of the cause of action for the sale of goods.

23.     The Verified Complaint was filed on February 19, 2008. **Exhibit B**.

24.     The Complaint states Ms. Texidor "defaulted" but does not state the date of default.

25.     However, the default must have been more than five years from February 19, 2008, as January 23, 2003 is the date from which CFS seeking interest.

26.     Uniform Commercial Code § 2-725 holds that a contract for the sale of goods is governed by a four year statute of limitations  as opposed to, for example, the six year statute of limitations for a general breach of contract.

27.     This four year U.C.C. statute of limitations has been adopted by nearly every state in the country, so even a basic review should have alerted Mr. Einstein and Tromberg to the possibility that their claim was time-barred.

28.     Under New York's "borrowing statute," CPLR 202, when a nonresident sues in New York on a cause of action accruing outside New York, the action "cannot be commenced" unless the action is within the statute of limitations of both New York and the jurisdiction where the cause of action accrued.  *Portfolio Recovery Assoc., LLC v. King*, 927 N.E.2d 1059, 1061-62 (N.Y. 2010), *citing Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (1999).

29.     Given Utah is the principal place of business of American Investment Bank, who was the putative original creditor, Utah law would apply, specifically the statute of limitations for "An action for breach of any contract for sale" being 4 years. UT ST § 70A-2-725.

30.     Even if Tromberg had mistakenly applied New York law, the result would have been the same, as "An action for breach of any contract for sale must be commenced within four years" in New York as well. N.Y. U.C.C. § 2-725.

31.     On information and belief, CFS, Tromberg, and Mr. Einstein filed suit based on the six year New York statute of limitations for contracts generally, not the four year U.C.C. statute of limitations governing the sale of the sale of goods as adopted by either Utah or New York.

32.     CFS purchased a portfolio of 85,000 charged of debts which, like the one against Ms. Texidor, were allegedly for the purchase of goods from Dell Computer and was allegedly financed by American Investment Bank.

33.     In 2007 and in 2008, the year it filed suit against Ms. Texidor, CFS filed thousands of collection lawsuits in New York including, on information and belief, the portfolio of 85,000 debts for the financing of the purchase of goods from Dell Computer.

34.     The New York state court website eCourts lists hundreds of CFS collection lawsuits with the firm of record being Tromberg, either under the firm's current name or prior name, Stephen Einstein & Associates, P.C.

35.     Therefore, on information and belief, CFS, Tromberg, and Mr. Einstein regularly filed collection lawsuits seeking to collect Dell Computer and other accounts arising from the sale of goods, and filed those collection lawsuits incorrectly assuming the six year statute of limitations for contracts generally in New York applied rather than the four year statute of limitations for sales of goods under the U.C.C. as adopted in UT ST § 70A-2-725 or N.Y. U.C.C. § 2-725.

36.     By filing, serving, and continuing to litigate time-barred collection lawsuits, Defendants CFS, Tromberg, and Mr. Einstein falsely represent to consumers including Ms. Texidor, and to the Court, that their lawsuit has merit when in fact the claim is barred by the statute of limitations.

37.     These Defendants misrepresent that the lawsuits are timely filed in order to deceive consumers into believing that the suits cannot be challenged on limitations grounds, that any attempt to challenge the lawsuit on limitations grounds would be futile, and that the consumer should not challenge the suit in court but instead pay the amount demanded. Moreover, the purpose of these misrepresentations is to deceive the civil court into entering judgment on time-barred claims, and awarding costs of court when the judgment creditors are not so entitled.

38.     In filing, serving, and continuing to litigate the time-barred lawsuit, Tromberg and Mr. Einstein represented that it had performed a meaningful attorney review of Ms. Texidor's putative account and determined, based on professional attorney judgment, that the lawsuit was timely.

39.     In fact, in the Collection Lawsuit Mr. Einstein signed, on behalf of CFS and his firm, "affirms under penalties of perjury, that he…has read this complaint and knows its contents, and that the same is alleged upon information and belief and believes it to be true" in the "ATTORNEY VERIFICATION" for the Verified Complaint. *Id.*

40.     If Mr. Einstein and Tromberg had performed a meaningful attorney review of the complaint, they would have, at a minimum, determined that the debt arose from the sale of goods, what statute of limitations applied to that sale of goods, and whether the statute of limitations where the cause of action accrued was less than the New York statute of limitations for the sale of goods.

41.     And since it was apparent on the face of the Verified Complaint that, at minimum, the debt might be for the sale of goods ("a Credit Agreement with…American Investment Bank/Dell Computer"), an attorney exercising even a basic review should have understood that the U.C.C., as adopted by New York or some other state, might govern the statute of limitations, and thus be prompted to determine whether the statute of limitations was less than the six years for breach of contract in New York.

42.     Either Mr. Einstein and Tromberg failed to perform a meaningful attorney review – despite their implied and express representations that he had – or he had performed the meaningful attorney review, realized the debt was time-barred, but nevertheless still filed, served, and continued to litigate the case, including opposing an order to show cause to vacate a judgment on a time-barred putative debt.

43.     Ms. Texidor has never had an account with American Investment Bank, nor purchased a computer or any other item from Dell Computer.

### Judgment based on False Affidavit of Service

44.     Defendants never served the Summons and Complaint on Ms. Texidor. On or about February 29, 2008, CFS through Tromberg filed an affidavit of service in the collections lawsuit, alleging service on Ms. Texidor at the address 483 Lincoln Ave., Apt. 3F, Brooklyn, NY 11208 on February 22, 2008 by leaving the Summons and Complaint with "LAUREN, RELATIVE." **Exhibit C** (Affidavit of Service).

45.     The affidavit filed purports that the 483 Lincoln address was Ms. Texidor's "last known residence" – this is false.

46.     Ms. Texidor never lived at this address.

47.     Ms. Texidor does not have a relative named Lauren, and does not have any relatives who

match the description provided in the Affidavit of Service.

48.     The process server was Azzam Abderrahman ("Mr. Abderrahman"), DCA License No. 0820996.

49.     From May 3, 1994 to the surrender of his license on January 31, 2014, Mr. Abderrahman engaged in repeated and widespread acts of process service misconduct, as catalogued in the New York City Department of Consumer Affairs Second Amended Notice of Hearing against him. **Exhibit D** (DCA Notice of Hearing).

50.     The NYC DCA charged Mr. Abderrahman with 7 counts of falsely alleging service, 2 counts of failing to properly serve, 30 counts of failing to make GPS records of service of process, 30 counts of failing to keep electronic records, 10 counts of failing to include the address of the process serving agency in the affidavit of service, 15 counts of failing to keep proper logbook records, and "failing to maintain the standards of integrity, honesty and fair dealing required of licensees." *Id.*

51.     Notably, in almost every one of the 7 counts for falsifying affidavits of service, Mr. Abderrahman had claimed to serve process upon a relative at the address. *Id.*

52.     Mr. Abderrahman's conduct was so contumacious that, after the DCA entered a consent order against him to comply with the law on January 30, 2013, he continued to violate the law, with 55 of the aforementioned charges of misconduct occurring after this consent order was entered. **Exhibit E** (2013 Consent Order).

53.     Accordingly, on January 31, 2014, DCA entered into a second consent order against Mr. Abderrahman, compelling him to surrender his process server license and banning him from reapplying for ten years. **Exhibit F** (2014 Consent Order).

54.     Because Ms. Texidor was never served, she did not know she was being sued and did not

appear in the action.

55.    On or about May 12, 2008, Tromberg filed an application for default in the collection lawsuit. The application was signed by Tromberg's then-name partner, Stephen Einstein. Mr. Einstein affirmed under the penalty of perjury that Ms. Texidor had been properly served and further that an additional copy of the Summons and Complaint had been mailed to "the Defendant's place of residence on 03/07/2008." **Exhibit G** (Application for Default Judgment). The application sought entry of judgment for $3,868.02. *Id.*

56.    On or about May 14, 2008, Tromberg obtained a default judgment against Ms. Texidor on behalf of CFS. Judgment was entered against Ms. Texidor in the amount of $3,877.96. **Exhibit H** (Default Judgment).

57.    Ms. Texidor did not learn of the Collection Lawsuit or the default judgment until years later because of the use of a false affidavit of service to obtain a "sewer service" default judgment. Ms. Texidor had also never received any letters, post-judgment garnishments or bank restraints, or otherwise learned about the judgment until the collection attempts beginning in September 2020, described below. Therefore, Ms. Texidor's claims related to the collection lawsuit, the false affidavit of service, and the default judgment obtained via sewer service are tolled.

### *Ms. Texidor Learns of Identity Theft Against Her*

58.    On August 9, 2016, Ms. Texidor received an income execution regarding another default judgment against her.

59.    On September 29, 2016, Ms. Texidor filed an Order to Show Cause to vacate that judgment, and given the evidence that Ms. Texidor had been incarcerated at the time, the Plaintiff stipulated to discontinue the case with prejudice. **Exhibit I** (Other Default Judgment

Vacated).

60.     This ordeal alerted Ms. Texidor to the fact that she had been a victim of identity theft.

61.     Ms. Texidor works hard to pay her bills on time because she wants people to think she is a reliable person.

62.     She also began to regularly change her PIN numbers and use cash when possible to avoid further identity theft.

63.     It seemed like no matter what she did, more debts that she never incurred would pop up and her money might be taken.

64.     Unfortunately, that's exactly what happened.

### *Tromberg Attempts to Collect on the Sewer Service Judgment 12 Years Later*

65.     On or about October 6, 2020, Tromberg signed an income execution to Bedford Center for Nursing and Rehabilitation, Ms. Texidor's employer.  *See* **Exhibit J** (Income Execution).

66.     The Income Execution was (purportedly) personally signed by Stephen Einstein. The income execution stated that CFS had obtained a judgment for $3,877.96 on May 14, 2008 with a "INTEREST DATE" of May 14, 2008. The Execution directed Bedford Center to satisfy the judgment by withholding and paying over to the Marshal in installments amount to 10% of wages. *Id.*

67.     CFS, Tromberg, and Einstein had the income execution forwarded to Marshal Ronald Moses for execution upon Ms. Texidor's employer.

68.     On or about November 12, 2020, Marshal Ronald Moses served the Income Execution on Bedford Center, listing the total amount as $8,696.16, $4,371.67 of which was interest on the fraudulently procured judgment.

69.     The human resources department of Bedford Center called Ms. Texidor on or around

November 23, 2020 to inform her of the income execution.

70.     By serving her employer with the income execution, CFS, Tromberg, and Einstein invaded Ms. Texidor's privacy and defamed her in the eyes of her employer.  CFS, Tromberg, and Einstein represented that they had a valid judgment and that Ms. Texidor owed a legally enforceable judgment, when in fact the judgment was obtained with a time-barred lawsuit on a debt that she never incurred using a false affidavit of service.

71.     While Ms. Texidor was upset that an income execution was happening to her a second time, she did at least know how to stop it, and so she went to the court that same day, November 23, 2020, and filed an Order to Show Cause to vacate the judgment. **Exhibit K** (OSC). Because she filed her OSC so quickly, she fortunately did not have any wages garnished due to the Income Execution.

72.     In the OSC, Ms. Texidor stated that she was not served the summons and complaint because she "never lived at that address." *Id.*

73.     Ms. Texidor also correctly stated that she was in the custody of the New York Department of Corrections from 2002 to 2009. *Id.*

74.     The Civil Court Judge, finding merit to the application, signed the Order and a hearing was set for December 11, 2020.

75.     This process was very frustrating because the debt was fraudulent and Ms. Texidor didn't owe money to them. Obtaining information on what the debt actually was proved to be difficult – Tromberg initially told her that the debt arose from a credit card, but later told her that the debt arose from a purchase from Dell Computer.

76.     On or around November 24, 2020, Tromberg sent Ms. Texidor a letter confirming receipt of her request for validation of the debt and attaching the default judgment, but for unknown

reasons sending the letter on the letterhead with Tromberg's old name, Stephen Einstein & Associates. **Exhibit L** (Stephen Einstein Letter).

77.     Then, on November 29, 2020, Tromberg sent another collection letter to Ms. Texidor. **Exhibit M** (Collection Letter).

78.     On or around November 30, 2020, Ms. Texidor handwrote a letter to Tromberg stating that the debt was not hers and that she never lived at the address on the default judgment.

### *Tromberg doubles down on the time-barred lawsuit and the sewer service by opposing Ms. Texidor's OSC with a deceptive Opposition*

79.     On December 1, 2020, Tromberg executed an Affirmation in Opposition to the Order to Show Cause and mailed the same to Ms. Texidor.   **Exhibit N** (Affirmation in Opposition). Along with the Affirmation, Tromberg included an undated cover letter seeking payment on the judgment by asking Ms. Texidor to call to "resolve this matter amicably." **Exhibit O** (Cover to Opposition).

80.     By signing and serving the Affirmation, Tromberg implicitly represented to Ms. Texidor that that it had meaningfully reviewed the facts and circumstances of the judgment and made a reasoned professional determination that the judgment was valid and correspondingly that the Affidavit of Service was truthful.

81.     Tromberg either failed to perform the necessary meaningful review that would have revealed that the underlying debt was time-barred and the Affidavit of Service was made by suspended process server Azzam Abderrahman, or it did perform such a review and made the statements in the Opposition aware of their falsity. If nothing else, in relying upon the false affidavit of the notorious sewer service process server Mr. Abderrahman in the Affirmation in Opposition to the Order to Show Cause, CFS and Tromberg ratified the sewer service, and attempted to retain the benefits obtained through that false affidavit: the default judgment.

82.     The Opposition falsely states that the action is "to recover the unpaid credit card that the defendant incurred with the plaintiff's predecessor." **Exhibit N**, p. 1. Had Tromberg truthfully disclosed the nature of the putative debt as it was alleged in the complaint – that Ms. Texidor "entered into a Credit Agreement with… American Investment Bank/Dell Computer" (*see* **Exhibit B**) – it would have disclosed that the debt was governed by the four year statute of limitations. And since the judgment Tromberg attached to the Opposition disclosed that the claim accrued more than five years from the filing of the collection lawsuit (as shown by the judgment Tromberg attached to its Opposition), disclosure of the true nature of the debt as a sale of goods would have shown the lawsuit was time-barred.

83.     By misrepresenting the nature of the debt in the Opposition, Tromberg concealed a complete defense to the underlying debt while asserting that Ms. Texidor had no meritorious defense to the debt.

84.     In addition, Tromberg coyly fails to attach the Affidavit of Service to its Opposition. A meaningful attorney review in drafting an Opposition to an OSC claiming lack of service and alleging facts about why service could not have been proper would be to review the Affidavit of Service that was in the firm's possession. Tromberg obviously had the Affidavit of Service as it was the firm that obtained the default judgment. On information and belief, Tromberg did not attach the Affidavit of Service to prevent Ms. Texidor from being able to refute specific allegations in the Affidavit as to the time, place and manner of service while at the same time asserting that Ms. Texidor could not refute service.

85.     Further, by withholding the Affidavit of Service Tromberg concealed the identity of the process server. As previously noted, the process server Mr. Abderrahman was a notorious process server whose license was suspended since 2014 after the NYC Department of Consumer

Affairs documented Mr. Abderrahman repeatedly executing false affidavits of service. By concealing the identity of the process server Tromberg sought to conceal from Ms. Texidor, who was *pro se* at the time, a fact that she could use to expose the falsity of the Affidavit of Service.

86.     The Opposition also misrepresents facts asserted by Ms. Texidor in her *pro se* OSC.

87.     The Opposition states that "the Defendant was not incarcerated at the time the contract was entered, which was on or about 6/25/2001." This statement is misleading because (1) it implies that Ms. Texidor asserted that she was incarcerated when the contract was entered into, which she did not, and (2) it implies that Ms. Texidor's residence was relevant to the question of whether she incurred the debt, which it is not.

88.     The Opposition states that "defendant does not deny the approximate, outstanding balance owed to the plaintiff." *Id.* This is patently false – the proposed Answer included with the OSC states, in pertinent part "I do not owe this debt," "It is not my debt. I am the victim of identity theft or mistaken identity," and "I dispute the amount of the debt." **Exhibit K**.

89.     Ms. Texidor's OSC incorporated this proposed Answer by reference in its request to allow her to file an answer. *Id.*

90.     Not only had Tromberg received this OSC, but they even attached it to the Opposition (**Exhibit N**, pp. 8-12).

91.     Tromberg also states in the Opposition "The defendant is required to produce documentary evidence to support her allegation that she was incarcerated during the lifetime of the card and during service of process." *Id.* This statement is misleading – Ms. Texidor's OSC does not allege in her OSC that she was incarcerated during the lifetime of the card and during service of process. It simply alleges that she was in Department of Corrections custody from

2002 to 2009.

92.     Without the court file, which was in archives at the time that Ms. Texidor filed her OSC, she had no way to dispute the Affidavit of Service because she simply had not seen it. The default judgment attached to Tromberg's Opposition does not provide that information either, despite the fact that CFS was the original judgment creditor and Tromberg was the firm that obtained the default judgment using the Affidavit of Service.

93.     Defendants opposed the OSC, counting on the fact that Ms. Texidor was a *pro se* consumer and that during the COVID-19 pandemic it was difficult for her to obtain free legal help, to retain the benefits of their illegally obtained judgment, including but not limited to the Income Execution that they would undoubtedly have resumed if Ms. Texidor's OSC was denied.

94.     On information and belief, Tromberg took no steps to obtain additional evidence to oppose the order to show cause. This was because Tromberg knew they had no such evidence, or that the evidence would show the fraudulent nature of the putative debt and the Affidavit of Service used to obtain the default judgment.

95.     At the December 11, 2021 hearing, conducted by video conference due to public health precautions during the COVID-19 pandemic, the presiding judge asked Tromberg if they had proof that the debt was hers. Tromberg said that they did, and so Ms. Texidor was told she had to go and get all the information she could to prove that the debt was not hers.

96.     Finding merit to Ms. Texidor's sworn denial of receiving the summons and complaint, the Court ordered a traverse hearing to be held on January 20, 2021.

97.     Ms. Texidor began to assemble proof that she was the victim of identity theft and the Affidavit of Service was false. On December 29, 2020, she filled out a Federal Trade

Commission Identity Theft Report. **Exhibit P** (ID Theft Affidavit).

98.     On January 8, 2021, Ms. Texidor was able to get some help from Legal Services NYC, which filed a letter as a friend of the court requesting that the traverse hearing be adjourned since the courthouse clerks estimated that the court file, including the affidavit of service, would not be located until at least March 6, 2021. **Exhibit Q** (LSNYC Letter).

99.     At the January 20, 2021 hearing, Defendants stated that they would agree to stipulate to discontinue the case despite their earlier opposition to the OSC.

100.

#### *Defendants' misconduct exposed Ms. Texidor to embarrassment at her job, deprived her of sleep, made her feel anxious and afraid of losing her job, and caused economic damages.*

101.    Ms. Texidor was told about the Income Execution against her, she had to tell her boss that she had to leave to go to court and get the judgment vacated. Having to do this made her feel embarrassed and ashamed.

102.    After filing the OSC, she was bombarded by questions at work about what had happened and whether she gotten it fixed.

103.    She would ask her boss for time off of work to make court appearances and gather evidence, and her boss would ask how many more times she would take off to handle it.

104.    Ms. Texidor wound up getting written up three times at her work for "calling out excessively," making her afraid that she might lose her job.

105.    Ms. Texidor suffered economic damages of having to use vacation days and personal days to travel (during COVID), *inter alia*, to court for her Order to Show Cause, to her prior parole officer to establish dates of and proof of address during the date of alleged service to go to a notary, and to mail papers related to her attempts to vacate the default judgment. She incurred

travel expenses, including subway fare and, when she drove, costs for parking. She paid costs, *inter alia*, for a notary and for copying and postage costs for mailing documents related to the order to show cause to vacate the default judgment. She had lost time for the many hours over months she spent attempting to vacate the sewer service judgment for the time-barred debt that she did not incur.

106.    After getting the Income Execution, Ms. Texidor determined that she needed help to fix her credit and deal with the identity theft. Unfortunately, like thousands of consumers, she was deceived by a "credit repair" company that did not do anything for her other than remove three inquiries from one of her credit reports, and charged her $19 for that.

107.    But-for Defendants' obtaining a default judgment with sewer service and then attempting to collect on the fraudulently obtained judgment, Ms. Texidor would not have suffered any of the above economic injuries.

108.    Ms. Texidor's job is her sole source of income, and she lives paycheck to paycheck, in part due to the high rents and cost of living in New York City.

109.    Even today when she goes to her office, she feels like they look down on her, believing that she does not pay her credit cards, which makes her feel embarrassed and ashamed.

110.    She felt very discouraged and upset being accused of incurring a debt that she was not actually responsible for.

111.    She wondered whether every other year she'd keep getting Income Executions trying to garnish her money for debts that were not hers.

112.    She could not sleep during this time – she would take medication to get to sleep but still wake up in the middle of the night, usually to anxiously check her bank account to make sure that no one was taking money out of her account.

113.    She needed the medication to get to sleep because her mind would be racing.

114.    The sewer service judgment made her feel overwhelmed, and she felt tired all the time from the lack of sleep.

115.    In order to obtain proof that the Affidavit of Service was false, she had to speak to her former parole officers. While they were understanding, they explained that what happened to her was something they had seen before, and that made her more afraid that this would keep happening to her.

116.    She was upset that if the Defendants had listened to her – when she filed her OSC or at the December 11 hearing – it would have ended in the same result, but instead she had to go out and gather all the evidence she could find.

117.    She has never even owned a laptop, only accessing the internet through her phone or using the fax or scanner at her work.

### D.        COUNT 1: FAIR DEBT COLLECTION PRACTICES ACT
### (as to all Defendants)

118.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

119.     The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses."  15 U.S.C. § 1692(e); see also *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 392 (5th Cir. 2002) ("Congress, through the FDCPA, has legislatively expressed a strong public policy disfavoring dishonest, abusive, and unfair consumer debt collection practices, and clearly intended the FDCPA to have a broad remedial scope.").

120.     Congress designed the FDCPA to be enforced primarily through private parties – such as plaintiff – acting as "private attorneys general."  *See* S. Rep. No. 382, 95th Con., 1st Sess. 5, ("[t]he committee views this legislation as primarily self-enforcing; consumers who have been subject to debt collection abuses will be enforcing compliance"); and *Jacobson v. Healthcare Fin. Servs.,* 516 F.3d 85, 91 (2d Cir. 2008) ("[i]n this way, the FDCPA enlists the efforts of sophisticated consumers like [plaintiff] as 'private attorneys general' to aid their less sophisticated counterparts, who are unlikely themselves to bring suit under the Act, but who are assumed by the Act to benefit from the deterrent effect of civil  actions brought by others.").

121.     The obligation alleged to be owed by plaintiff is a "debt" as defined by 15 U.S.C. § 1692a(5) because the putative debt was incurred primarily for family, personal or household purposes, specifically financing for the sale of goods from Dell Computer. Notably, in the Verified Complaint, Defendants CFS, Tromberg, and Mr. Einstein stated the putative debt arose from a "consumer credit transaction."

122.     For the reasons stated in the "Parties" section of this Complaint, each Defendant is a debt collector within the meaning of 15 U.S.C. § 1692a(6).

123.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1692a(3) because Plaintiff was alleged to owe a "debt."

124.     Defendants violated the following sections of the FDCPA: 15 U.S.C. §§ 1692e and 1692f.  By way of example and not limitation, Defendants CFS, Tromberg, and Mr. Einstein violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; misrepresenting the character, amount, or legal status of the debt; the representation that nonpayment will result in the seizure, garnishment, attachment, or sale of any property or

wages of any person unless such action is lawful; falsely representing or implying an individual is an attorney or that a communication is from an attorney; threatening to take and actually taking an action prohibited by law; and using unfair or unconscionable means.

125.    Defendants ABC Process Service, and Azzam Abderrahman violated the FDCPA by taking the following actions in an attempt to collect a debt or in connection with an attempt to collect a debt: using false, deceptive or misleading representations or means; taking an action prohibited by law; and using unfair or unconscionable means.

126.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

127.    Ms. Texidor suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for making copies, for postage, for a notary, for "credit repair" services, and for travel including subway fare, use of a vehicle, and paying for parking; lost time for having to go to the courthouse twice, appear on her OSC to vacate a sewer service judgment and to gather evidence for the traverse hearing necessitated by the deceptive Opposition to the OSC; lost wages in that she had to use her vacation days and sick days to spend time fighting the sewer service judgment.

128.    Ms. Texidor's injuries are analogous to, *inter alia*, the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, and abuse of process.

129.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on

and use that information in attempting to collect debts.

**E.       COUNT 2: NEW YORK GENERAL BUSINESS LAW SECTION 349 *ET SEQ.***
**(as to all Defendants )**

130.    Plaintiff repeats and re-alleges each and every allegation set forth above as if reasserted and re-alleged herein.

131.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state…"

132.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). An individual may also be awarded punitive damages.

133.    As enumerated in the Statement of Facts, Defendants violated N.Y. Gen. Bus. Law § 349 et seq. by using deceptive acts and practices in the conduct of their businesses that have broad impact on consumers at large.

134.    Defendants' wrongful and deceptive acts caused injury and damages to Plaintiff.

135.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 et seq, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

136.    The injuries inflicted on Plaintiff by Defendants are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

137.    Ms. Texidor suffered economic injuries that historically has provided a basis for lawsuits

in American courts, including but not limited to out of pocket expenses for making copies, for postage, for a notary, for "credit repair" services, and for travel including subway fare, use of a vehicle, and paying for parking; lost time; lost wages in that she had to use her vacation days and sick days to spend time fighting the sewer service judgment.

138.    Ms. Texidor's injuries are analogous to the following common law claims: defamation, negligence, invasion of privacy, intrusion upon seclusion, malicious civil prosecution, and abuse of process.

139.    Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt, in ensuring that a debt is not linked to the wrong party, and in furnishing agents with accurate information when those agents rely on and use that information in attempting to collect debts.

### F.      COUNT 3: NY JUDICIARY LAW § 487
### (as to Tromberg and Mr. Einstein)

140.    New York Judiciary Law § 487 creates a private right of action against an attorney or counselor who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party;" or "willfully receives any money or allowance for or on account of any money which he has not laid out, or becomes answerable for."

141.    As enumerated in the Statement of Facts, Tromberg and Mr. Einstein violated Judiciary Law § 487.

142.    Plaintiff is entitled to actual damages, treble damages, and attorneys' fees and costs for the violations of N.Y. Judiciary Law § 487, and Plaintiff so seeks.

143.    The injuries inflicted on Plaintiff by Tromberg and Mr. Einstein are concrete and particular, and these injuries have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.

144.    N.Y. Judiciary Law § 487 is "the modern-day counterpart of a statute dating from the first decades after Magna Carta; its language virtually (and remarkably) unchanged from that of a law adopted by New York's Legislature two years before the United States Constitution was ratified." *Amalfitano v. Rosenberg,* 12 N.Y.3d 8, 14 (N.Y. 2009).

145.    Because of the special injuries inflicted by an attorney using deceit to mislead the court or any party, an injury to the integrity of the court proceedings and the use of the courts to determine the truth, a deceit does not need to be successful to violate N.Y. Judiciary Law § 487. *Id.*

146.    In addition to those special injuries, economic injuries that are the proximate result of the deceit, namely the expenses of defending against a deceitful lawsuit, are recoverable under N.Y. Judiciary Law § 487. *Id*

147.    Ms. Texidor suffered economic injuries that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for making copies, for postage, for a notary, for "credit repair" services, and for travel including subway fare, use of a vehicle, and paying for parking; lost time for having to go to the courthouse twice, appear on her OSC to vacate a sewer service judgment and to gather evidence for the traverse hearing necessitated by the deceptive Opposition to the OSC; lost wages in that she had to use her vacation days and sick days to spend time fighting the sewer service judgment.

### G.    COUNT #4: GROSS NEGLIGENCE (AS TO ALL DEFENDANTS)

148.    Plaintiff repeats and realleges each and every allegation set forth above as if reasserted and realleged herein.

149.    Defendants, as putative creditor assignee and debt collectors, owed Ms. Texidor a duty of reasonable care in their debt collection efforts.

150. Defendants' failure to exercise even slight care or slight diligence amounts to gross negligence.

151. Had Defendants made even the smallest effort to review the statute of limitations before filing the time-barred lawsuit, no lawsuit would have been filed against Ms. Texidor.

152. Had Defendants made even the smallest effort to review the Verified Complaint and Affidavit of Service when they received Ms. Texidor's OSC, they would have seen that the lawsuit had been time-barred and that the judgment was procured using an affidavit by a notoriously deceitful process server, Azzam Abderrahman, and consented to vacating the judgment and discontinuing the lawsuit with prejudice.

153. Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing, particularly the due process rights for consumers underlining the purpose of the statute of limitations on a sale of goods cause of action.

154. Upon information and belief, Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

155. Defendants' conduct demonstrates a high degree of moral culpability and willful or wanton negligence or recklessness. As a result, Ms. Texidor is entitled to a punitive damage award.

156. Ms. Texidor suffered economic injuries due to Defendants' gross negligence that historically has provided a basis for lawsuits in American courts, including but not limited to out of pocket expenses for making copies, for postage, for a notary, for "credit repair" services, and for travel including subway fare, use of a vehicle, and paying for parking; lost time; lost wages in that she had to use her vacation days and sick days to spend time fighting the sewer service judgment.

## **H.** **JURY DEMAND.**

157.    Plaintiff demands a trial by jury.

## **I.** **PRAYER**

WHEREFORE, Plaintiff requests the following relief:

a.      A declaration that all Defendants have committed the violations of law alleged in this action;

b.      Statutory damages under 15 U.S.C. § 1692k and GBL 349;

c.      Reasonable attorney's fees and costs;

d.      Actual damages;

e.      Treble damages;

f.      Exemplary and punitive damages;

g.      An order, pursuant to GBL 349(h), enjoining and directing Defendants to cease violating that statute;

h.      Prejudgment and post judgment interest as allowed by law;

i.      All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

Dated:  Brooklyn, New York
        August 27, 2021

Respectfully submitted,

/s/

Ahmad Keshavarz
The Law Office of Ahmad Keshavarz
16 Court St., 26th Floor
Brooklyn, NY 11241-1026
Phone: (718) 522-7900
Fax:    (877) 496-7809
Email: ahmad@NewYorkConsumerAttorney.com