Page 97

1     S. Morris
2  they be licensed, especially in the city of
3  New York, they have to be DCA licensed, and
4  there has to be oversight on those process
5  servers.
6     Q.  Anything else besides those
7  requirements?
8     A.  Nope.
9     Q.  And in 2008 you were using your
10 codefendant ABC Process Service for service
11 of consumer debt collection lawsuits;
12 correct?
13    A.  I believe that's correct.
14    Q.  And who made the decision to use
15 ABC Process Service for that service?
16    A.  I believe it was Stephen Einstein.
17    Q.  And was that the only process
18 service firm that was being used at that time
19 for consumer debt collection lawsuits?
20    A.  I believe, but I can't confirm
21 that.
22    Q.  And every attorney at your firm in
23 2008 would have understood that a truthful
24 Affidavit of Service was necessary to enter a
25 default judgment against a consumer; correct?

Page 98

1     S. Morris
2     A.  Correct.
3     Q.  And your firm would -- I think you
4  previously testified to this, but your firm
5  would retain copies of Affidavits of Service
6  for seven years; correct?
7     A.  Potentially more.  We closed them
8  seven years from the date of the file being
9  closed.  So if a file was open for ten years,
10 it would be open for another seven years from
11 the closure date.
12    Q.  I see.  So that seven-year
13 retention period is based on whether the file
14 is closed or not in your system?
15    A.  Correct.
16    Q.  And is that automatic, or is it
17 something that they manually go through and
18 determine if it's more than seven years?
19    A.  It's done on an annual basis.
20       MR. KESHAVARZ:  Wait.  Did you say
21    it was done on an annual basis
22    automatically or annual basis manually?
23    I'm sorry.  I didn't catch that.
24       THE WITNESS:  Manually on an annual
25    basis.

Page 99

1     S. Morris
2       MR. KESHAVARZ:  Sorry for
3    interrupting.
4     Q.  And at what point did Stephen
5  Einstein stop using ABC Process Service?
6     A.  I have no idea.
7     Q.  So does that mean that it was when
8  you were not at the firm?
9     A.  I believe it was prior to me
10 leaving the firm, but I don't know the dates
11 and when he made the decision.
12    Q.  What was the basis of the decision?
13    A.  Like I said, I don't know why he
14 did or when he did.
15    Q.  Did you ever communicate with Jay
16 Brodsky in 2008?
17    A.  I've communicated with Jay Brodsky.
18 I couldn't tell you if in 2008 I communicated
19 with him.
20    Q.  And did you communicate with him
21 pursuant to your work at Stephen Einstein?
22    A.  Yes.
23    Q.  And what were you communicating
24 with him about?
25    A.  We'd communicate based upon process

Page 100

1     S. Morris
2  of service.  We'd communicate on compliance
3  management work.  I know one of the things we
4  did institute I believe with Jay and then
5  predecessors is once we started seeing stuff
6  like the Pfau case, which obviously wasn't
7  ABC, it was a different process server, try
8  and institute some type of reporting just to
9  look for potential sewer service infractions.
10    Q.  And when was that instituted?
11    A.  I couldn't tell you the year.
12    Q.  Was it after 2008?
13    A.  I don't remember.
14    Q.  Could you determine what year that
15 was?
16    A.  It was probably somewhere around
17 when Pfau was going through the court system.
18    Q.  How long does your firm retain
19 emails?
20    A.  I believe it's a seven-year
21 retention period as well.
22    Q.  And was that the case in 2008?
23    A.  I don't believe so.
24    Q.  Do you know what it was in 2008?
25    A.  I don't think there was a policy as

